**SIGNED this 4th day of October, 2012**

_____
Marcia Phillips Parsons
UNITED STATES BANKRUPTCY JUDGE

_____

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF TENNESSEE

| In re | | |
|---|---|---|
| APPALACHIAN OIL COMPANY, INC., | | No. 09-50259 |
| Debtor. | | Chapter 11 |
| APPALACHIAN OIL COMPANY, INC., | | |
| Plaintiff, | | |
| vs. | | Adv. Pro. No. 10-5064 |
| VIRGINIA STATE LOTTERY DEPARTMENT, | | |
| Defendant. | | |

# **M E M O R A N D U M**

APPEARANCES:

Mark S. Dessauer, Esq.
Hunter, Smith & Davis
Post Office Box 3740
Kingsport, Tennessee 37664
*Attorney for Plaintiff*

Gregory C. Logue, Esq.
Robert L. Vance, Esq.
Woolf, McClane, Bright, Allen & Carpenter
Post Office Box 900
Knoxville, Tennessee 37901
*Attorneys for Defendant*

**Marcia Phillips Parsons, Chief United States Bankruptcy Judge**. This preference action pursuant to 11 U.S.C. §§ 547(b) and 550(a) came before the court for trial on May 2, 2012. At issue was whether the preferential payments made by the debtor Appalachian Oil Company to the Virginia State Lottery Department fall within the preference exceptions of § 547(c)(2) and (c)(4). As discussed hereafter, the court concludes that four of the five preferential payments at issue are excepted from avoidance under § 547(c)(2) and that a portion of the remaining preference is protected by § 547(c)(4). Accordingly, the plaintiff will be awarded a judgment against the defendant in the amount of $30,316.09 plus prejudgment interest. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(F).

I.

In a Joint Pretrial Statement filed April 26, 2012, the parties stipulated to the following facts:

1. Plaintiff Appalachian Oil Company, Inc. ("APPCO") filed a voluntary Chapter 11 petition in bankruptcy on February 9, 2009 (the "Petition Date").

2. Prior to its bankruptcy filing, APPCO operated fifty seven (57) convenience stores located in the States of Tennessee, Kentucky and Virginia.

3. On approximately December 7, 1999, APPCO and Virginia State Lottery Department ("Virginia Lottery") entered into a Virginia Lottery Retailer Contract governing the terms under which APPCO was to operate as a lottery retailer in Virginia. Thereafter, APPCO was granted a license to operate as a Virginia Lottery retailer and the license was renewed on an annual basis.

4. As part of APPCO's obligations as a lottery retailer, APPCO was to designate a bank account from which Virginia Lottery was authorized to make electronic fund transfers or withdrawals in payment of the amounts due Virginia Lottery. Effective September 2, 2008, APPCO designated for this purpose its account at Branch Banking & Trust Company ("BB&T"), Account No. 0000116610930. The Authorization Agreement for Preauthorized Payments completed by APPCO and designating BB&T Account No. 0000116610930 as the account Virginia Lottery was to make electronic sweeps states in part:

> Bank signature verifies that this account is titled as: "(Retailer Business Name)/Virginia Lottery Trust."

5. Notwithstanding the content of the Authorization Agreement for Preauthorized Payments signed by APPCO and BB&T, Account No. 0000116610930 established by APPCO at BB&T was titled: "Appalachian Oil Company, Inc. In Trust for TN Education Lottery Corporation." At all times material hereto, Virginia Lottery was not aware that it was drafting an account designated for the benefit of the Tennessee

2

Lottery Corporation.

. . . .

7. There are two types of products sold by lottery retailers in Virginia: instant tickets and on-line tickets. Instant tickets are "instantly" available to determine if a purchaser is entitled to a prize, while on-line tickets are held by the purchaser pending a later drawing.

8. Virginia Lottery has uniform billing procedures for all lottery retailers and . . . [t]he following uniform billing procedures were used by Virginia Lottery with respect to APPCO during the time period at issue in this case:

>  (a) APPCO was billed on a weekly basis.
>
>  (b) The weekly billing period was from Wednesday morning to the following Tuesday night.
>
>  (c) A billing statement was made available to lottery retailers on Wednesday morning that encompassed the preceding week's transactions including instant ticket activations, and any validation or payments by the retailer, adjustments to the account, on-line sales during that week, less commissions due the retailer. The remainder was a net amount which was the "Balance Due" and represented the amount due from APPCO to Virginia Lottery for that prior week.
>
>  (d) The "Balance Due" was the amount "swept" or drafted by Virginia Lottery by electronic fund transfers ("EFT").
>
>  (e) The "Balance Due" was drafted by Virginia Lottery from APPCO on the Thursday following the Wednesday morning that the invoice was made available to APPCO.

. . . .

10. When a Virginia Lottery EFT draft on a lottery retailer designated account is returned for insufficient funds, the lottery retailer or APPCO in this instance has a responsibility to immediately remit the designated amount to Virginia Lottery.

11. Prior to the ninety (90) day period before APPCO's bankruptcy filing (the "Preference Period"), APPCO had no history of returned drafts to Virginia Lottery.

12. One ETF draft issued by Virginia Lottery on APPCO's Account No. 0000116610930 at BB&T during the Preference Period was returned for insufficient funds. Virginia Lottery's ETF draft of $33,303.34 on January 8, 2009 was returned for insufficient funds.

13. Virginia Lottery received the following payments during the Preference Period which were paid by Virginia Lottery issuing ETF drafts on the following APPCO bank account:

| Sweep or Due Date | Amount | Payment Date | APPCO Account On Which Defendant EFT Draft Drawn |
|---|---|---|---|
| 11/13/2008 | $24,860.06 | 11/13/2008 | 0000116610930 |
| 11/20/2008 | $23,805.25 | 11/18/2008 | 0000116610930 |
| 11/27/2008 | $31,266.65 | 11/20/2008 | 0000116610930 |
| 12/04/2008 | $34,854.20 | 12/20/2008 | 0000116610930 |
| 12/11/2008 | $32,680.55 | 12/20/2008 | 0000116610930 |
| 12/18/2008 | $46,926.10 | 12/20/2008 | 0000116610930 |
| 12/25/2008 | $35,538.77 | 12/25/2008 | 0000116610930 |
| 01/01/2009 | $42,055.95 | 01/01/2009 | 0000116610930 |

(collectively the "EFT Drafts").

14. Virginia Lottery received the following payments from APPCO by direct wire transfer from the following bank account of APPCO to a bank account of Virginia Lottery during the Preference Period:

| Amount of Funds Wired | Date Funds Wired by APPCO | APPCO Account From Which Funds Wired | Purpose of Payment | Payment Due Date |
|---|---|---|---|---|
| $33,303.34 | 01/12/2009 | 0000116280353 | EFT Returned Draft of 01/08/2009 | 01/08/2009 |
| $43,963.95 | 01/14/2009 | 0000116280353 | Invoice of 01/14/2009 | 01/15/2009 |
| $48,061.87 | 01/21/2009 | 0000116280353 | Invoice of 01/21/2009 | 01/22/2009 |
| $45,499.69 | 01/28/2009 | 0000116280353 | Invoice of 01/28/2009 | 01/29/2009 |
| $42,423.14 | 02/05/2009 | 0000116280353 | Invoice of 02/04/2009 | 02/05/2009 |

(collectively the "Wire Transfers").

15. Plaintiff's BB&T Account No. 0000116280353 was an APPCO business checking account in the name of "Appalachian Oil Company, Inc., 1992 Highway 75, Blountville, TN 37617-5830." This account was not the APPCO account designated for the benefit of the Tennessee Education Lottery Corporation from

which the EFT Drafts were drawn.

In an order entered March 23, 2012, this court granted summary judgment in favor of Virginia Lottery with respect to APPCO's claim to avoid as preferential the eight EFT Drafts. In the accompanying memorandum opinion, the court concluded that the EFT Drafts were trust fund property of Virginia Lottery, and therefore nonavoidable, as only payments of property of the debtor are subject to avoidance as preferential under 11 U.S.C. § 547(b). The court also denied Virginia Lottery's summary judgment motion as to the five Wire Transfers from APPCO to Virginia Lottery that APPCO claims were preferences, concluding that they were property of the debtor APPCO.

For purposes of trial, Virginia Lottery stipulated that APPCO can establish each of the elements of a preference under § 547(b) as to the five Wire Transfers, and that APPCO is entitled to recover the value of each of the Wire Transfers pursuant to 11 U.S.C. § 550(a)(1), to the extent that Virginia Lottery does not prevail on the § 547(c) defenses it raises. As to these defenses, Virginia Lottery asserts that the last four of the Wire Transfers, those which took place on January 14, 21, 28, and February 5, 2009, are excepted from avoidance under § 547(c)(2). The first Wire Transfer, the one that occurred on January 12, 2009, was for the purpose of replacing an EFT Draft on January 8, 2009, that was returned for insufficient funds. Virginia Lottery concedes that this Wire Transfer was outside the parties' ordinary course of business, but maintains that it is nonetheless excepted from avoidance under § 547(c)(4). The court will examine each of these arguments, addressing the § 547(c)(2) exception first.

II.

Under § 547(c)(2) of the Bankruptcy Code, a transfer that otherwise meets the elements of a preference under § 547(b) may not be avoided to the extent that such transfer was "in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, [and] (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or (B) made according to ordinary business terms." 11 U.S.C § 547(c)(2). This subsection, commonly referred to as the "ordinary course of business exception," was designed to "protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of the [d]ebtor and the transferee." *Waldschmidt v. Ranier (In re Fulghum Const.*

5

*Corp.)*, 872 F.2d 739, 743 (6th Cir.1989) (quoting *Energy Coop., Inc., v. SOCAP Int'l, Ltd. (In re Energy Coop., Inc.)*, 832 F. 2d 997, 1004 (7th Cir. 1987)). Pursuant to § 547(g), the creditor bears the burden of proving the nonavoidability of a transfer under § 547(c)(2) by a preponderance of the evidence. *See Logan v. Basic Distribution Corp. (In re Fred Hawes Org., Inc.),* 957 F.2d 239, 242 (6th Cir. 1992).

Since the 2005 amendments to the Bankruptcy Code, § 547(c)(2) provides two alternative means of establishing the exception. Upon establishing that the debt for which the preferential payment was made was incurred by the debtor in the ordinary course of the parties' business or financial affairs, the creditor may prevail if it additionally establishes that the payment was (A) in the ordinary course of business of the parties; or (B) according to ordinary business terms. *See* 5 *Collier on Bankruptcy* ¶ 547.04[2] (16th ed. 2012). As explained by the Sixth Circuit Court of Appeals, Paragraph A is a subjective test, which "requires proof that the debt and its payment are ordinary in relation to other business dealings between that creditor and that debtor." *Luper v. Columbia Gas of Ohio, Inc. (In re Carled, Inc.)*, 91 F.3d 811, 813 (6th Cir.1996). Paragraph B of § 547(c)(2) is an objective test which "requires proof that the payment is ordinary in relation to the standards prevailing in the relevant industry." *Id.* Both tests involve a factual determination, with Paragraph (A)'s ordinary course of business test requiring an examination of several factors, "including timing, amount and manner a transaction was paid and the circumstances under which the transfer was made." *In re Fred Hawes Org., Inc.,* 957 F.2d at 244. Paragraph B's "'ordinary business terms' means that the transaction was not so unusual as to render it an aberration in the relevant industry." *In re Carled, Inc.*, 91 F.3d at 818.

In the present case, Virginia Lottery asserts that the four Wire Transfers that took place on January 14, 21, 28, and February 5, 2009, are excepted from avoidance under both Paragraph (A) and (B) of § 547(c)(2). With respect to the subjective test of Paragraph A which looks at whether the payments were consistent with the parties' prior course of business dealings, Virginia Lottery acknowledges that all prior payments by APPCO had been by EFT sweep initiated by Virginia Lottery from APPCO's trust account, and that the four payments in question were made by APPCO from its business account by wire transfer rather than an EFT draft. Virginia Lottery asserts, however, that this was a mere change in method of payment, which is insufficient to take the

6

payments outside the parties' ordinary course of business, citing *Scroggins v. BP Exploration & Oil, Inc. (In re Brown Transport Truckload, Inc.)*, 161 B.R. 735, 740 (Bankr. N.D. Ga. 1993) ("changes in method of payment by a debtor to a creditor are not enough to make the business relationship not ordinary").

As evidentiary support for their contention that the last four Wire Transfers were in the ordinary course of the parties' business, Virginia Lottery offered the testimony of Bill Lockhart, the investments and cash operations manager of Virginia Lottery. Mr. Lockhart testified that upon learning on the morning of January 12, 2009, that Virginia Lottery's previous sweep of APPCO's account had been returned for insufficient funds, he contacted Rick Jones at APPCO, who arranged to have APPCO wire replacement funds that day out of its business account rather than the designated trust account. Mr. Lockhart testified that he and Mr. Jones discussed in that conversation ways to reduce the outstanding debt to Virginia Lottery, with Mr. Jones advising that he would develop a list of excess or surplus ticket stock that Virginia Lottery could pick up at APPCO stores. Mr. Jones also advised Mr. Lockhart that APPCO was in the process of obtaining new financing and that when secured APPCO would go back to normal ticket orders and stock.

Mr. Lockhart also testified that Virginia Lottery did not impose any other changes on APPCO as a result of the failed EFT sweep, and that APPCO continued thereafter to sell both instant and on-line Virginia Lottery tickets. Mr. Lockhart acknowledged that APPCO began paying Virginia Lottery by wire transfer rather than EFT sweep, but testified that this was a unilateral, voluntary decision by APPCO, and that in fact Virginia Lottery had to turn off the automatic draft of APPCO's trust account when it began receiving payments by wire transfers. Mr. Lockhart admitted that Virginia Lottery knew that APPCO was experiencing financial difficulties and that its relationship with the Tennessee Lottery had ended but maintained that Virginia Lottery took no action against APPCO as a result of that knowledge. Mr. Lockhart also testified that Virginia Lottery "quite often takes different styles of payment," and that under Virginia law it can "take any form necessary to transact business," including payment by wire transfer following the dishonor of a draft.

To counter the assertion that the four Wire Transfers were in the parties' ordinary course of business, APPCO pointed out that the Virginia Administrative Code states that all retailers shall

7

make payments through the EFT process "unless the director designates another form of payment," 11 Va. Admin. Code § 5-31-60, and Mr. Lockhart admitted that the director of the Virginia Lottery had not designated any other form of payment by APPCO. Mr. Lockhart also conceded that payment by wire transfer rather than by EFT draft and payment from a bank account other than the designated trust account was contrary to the parties' contract and inconsistent with the parties' general course of dealing. Lastly, Mr. Lockhart admitted that payment by wire transfer resulted in less debt exposure for Virginia Lottery than payment by EFT sweep because the former was immediate payment while the latter could result in possible chargeback in the event of insufficient funds.

The evidence also indicated that, with the exception of the last Wire Transfer, APPCO made the Wire Transfers on Wednesday afternoon, after having received its billing statement on Wednesday morning. Under the EFT process, Virginia Lottery drafted APPCO's trust account on Thursday of each week, although APPCO was required to place the amount owed in its trust account by 2:00 p.m. on Wednesday afternoons. Thus, the Wire Transfers with the exception of the last one made on Thursday, February 5, 2009, resulted in Virginia Lottery being paid a day earlier than usual. The evidence also demonstrated that during the last month of operations, when the Wire Transfers were being made, APPCO did not activate as many instant tickets as usual, such that it appeared to be winding down its operations in some respects.

Upon review, the evidence was undisputed that the change to payment by wire transfer as to the last four Wire Transfers was a voluntary decision by APPCO rather than the result of unusual or extraordinary collection efforts by Virginia Lottery. In fact, it was commendable that Virginia Lottery imposed no new conditions or terms on APPCO notwithstanding its financial difficulties and the termination of its relationship with Tennessee Lottery. However, determining whether a preferential payment is in accordance with the parties' ordinary course of business requires more than just an analysis of the creditor's behavior. A reviewing court must also examine the payment from the debtor's perspective. *See Central Hardware Co. v. Sherwin-Williams Co. (In re Spirit Holding Co.)*, 153 F.3d 903, 905 (8th Cir. 1998) (holding that the absence of unusual collection practices on the part of a creditor did not necessarily make the transfers ordinary; the court must determine whether the action was unusual on the part of either the debtor or the creditor); *Pony*

*Express Delivery Servs., Inc. v. Andreini & Co. (In re Pony Express Delivery Servs., Inc.)*, No. 02-6276, 2004 WL 5848055, *5 (Bankr. N.D. Ga. July 26, 2004), *rev'd on other grounds*, 440 F.3d 1296 (11th Cir. 2006) (noting that the debtor had changed its method of payment because two prior attempts to pay the debt by the usual method had failed, and observing that "[t]he reason why the debtor changed its method of payment is relevant to the inquiry of whether the change is substantial enough to render the payment outside of the ordinary course of dealings between the parties"); *see also In re Carled, Inc.*, 91 F.3d at 815 (quoting S. Rep. No. 989, 95th Cong., 2d Sess. 88, reprinted in 1978 U.S.C.C.A.N. 5787, 5874) (The legislative history for § 547(c)(2) states that its purpose "is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.").

From APPCO's perspective, the last four Wire Transfers were more than just a mere change in method of payment. By the time of the Wire Transfers APPCO was experiencing significant financial difficulties. EFT sweeps from the trust account had failed due to insufficient funds, and Tennessee Lottery had terminated its relationship with APPCO such that it was not longer able to sell Tennessee lottery tickets in its Tennessee stores. By initiating payment by wire transfer on the day that the billing statement was distributed, APPCO was going out of its way to ensure that Virginia Lottery was paid immediately and with certainty so that it would have no reason to cut off APPCO's ability to sell lottery tickets. In contemporaneous emails between Mr. Lockhart and other Virginia Lottery employees, Mr. Lockhart recounted telephone conversations between himself and Rick Jones of APPCO, noting that Mr. Jones understood that Virginia Lottery was "concerned about [its] exposure" and that the two had discussed "reduc[ing] the Virginia Lottery's current total liability." With this goal, Mr. Jones further indicated that he would prepare a list of excess stock to be picked up, but that APPCO would "go back to *normal* ticket orders and activations," when anticipated financing was secured. When asked about these emails, Mr. Lockhart admitted that the wire transfers minimized Virginia Lottery's exposure, and that immediate payment by wire transfer contrasted with the uncertainty of the EFT process which had a built-in two-day delay before Virginia Lottery knew whether the EFT draft was successful. As stated by Mr. Lockhart during his deposition testimony,

I think Rick [Jones of APPCO] tried to give it to us a day or two ahead of time just

9

>to keep us at ease and not having to worry about not being paid. I think he said, "I'll probably just go ahead and pay you on Wednesday," because he really didn't want to damage their reputation with the Virginia Lottery. Every conversation I had he wanted to make sure that once they secured financing, that they went back to total arrangements, full ticket stock, the whole nine yards.

With this context, it is evident that the Wire Transfers to Virginia Lottery were outside the parties' ordinary course of business dealings. The Wire Transfers represented unusual activity by APPCO to maintain its ability to continue to sell Virginia Lottery tickets. The payments were a day earlier than the parties' prior dealings, by a different method than the parties' contract and customary practice, from a different bank account than the one specified in the parties' contract and normally used by the parties, and initiated by APPCO rather than Virginia Lottery. When the evidence is viewed in its entirety, it is evident that the Wire Transfers are dissimilar from the payments in the *Brown Transport* case cited by Virginia Lottery, which involved a simple change in the method of payment unconnected to the debtor's financial difficulties. *See In re Pony Express Delivery Servs., Inc.*, 2004 WL 5848055, *5 (noting that "[i]n *Brown Transport*, there was no evidence that the change in method of payment was a direct result of the debtor's financial difficulties or unusual collection activities of the creditor"). Accordingly, the court concludes that the Wire Transfers are not excepted from avoidance under § 547(c)(2)(A), the subjective test of the ordinary course of business exception.

The court turns next to the question of whether the four Wire Transfers fall within § 547(c)(2)(B), that is, whether they were "made according to ordinary business terms." Virginia Lottery asserts that payment by wire transfer is within the scope of ordinary business terms in the lottery industry. To support this argument, Virginia Lottery asserts that numerous other state lotteries routinely require lottery retailers to transmit funds by wire transfer when a sweep of a lottery trust account is returned for insufficient funds. Alternatively, Virginia Lottery contends that its own statutes and regulations define the scope of ordinary business terms because each state's lottery system is unique. *See Bulan v. Niagara Mohawk Power Corp. (In re Al Cohen's Rye Bread Bakery, Inc.)*, 202 B.R. 546, 548 (Bankr. W.D.N.Y. 1996) (noting that for monopolies regulated by the state, such as utilities, regulatory mandates will define the scope of ordinary business terms, but also observing that the behavior of the parties is not sufficient in and of itself to sustain the creditor's burden of proof as to ordinary business terms in the industry). In this regard, Virginia Lottery

10

asserts that pursuant to Virginia Code Annotated § 58.1-4021, Virginia's rules and regulations provide for the wire transfer of funds from a lottery retailer to the state lottery if the retailer's bank dishonors a check or draft.

In response, APPCO argues that there is no industry standard for lotteries because each state lottery is governed by its own statutory and regulatory scheme together with the contract between the state lottery and the lottery retailer. As support for this assertion, APPCO references Mr. Lockhart's deposition testimony wherein he states,

> A. I just recently did a survey of different billing practices of lotteries, and there are umpteen different days' delay, consignment, some don't allow, some allow you to sell out and prove you sold before you pay, some require payment up front. I mean, it's lot of different things out there.
>
> Q. So it differs from state to state?
>
> A. Yes, it does.

Notwithstanding this testimony, the court rejects the proposition that there is no industry standard for state lotteries because they are governed by state law and contract, or because their billing practices may vary from state to state. The standard for § 547(c)(2)(B) as articulated by the Sixth Circuit in *Carled* is whether the transaction is so unusual as to render it an aberration in the relevant industry. *In re Carled, Inc.*, 91 F.3d at 818. The creditor in *Carled* was a public utility, presumably regulated by state law, yet the payments in question were found to be made according to ordinary business terms because the evidence showed that it was "not aberrational, unusual, or idiosyncratic for utility companies" to accept the payments in question. *Id.*

Applied to the present case, regulations from other state lotteries demonstrate that payment by wire transfer is an acceptable, or even mandated method of payment, after a lottery retailer has transmitted funds with a bad check or draft. *See* S.C. Code Ann. Regs. 44-90.20(C) ("The Executive Director may require a lottery retailer to make payment of any past due or delinquent amount by certified check or wire transfer."); 11 Ill. Admin. Code § 1770.90(c)(1) (providing that in the event of a delinquency the retailer must deliver payment to the lottery's regional offices or wire transfer the funds); Okla. Admin. Code § 429:10-1-11(c)(1) (in the event of a first NSF default, the Oklahoma Lottery Commission will require the retailer to deposit the necessary funds to enable a wire transfer to be completed); *see also* N.D. Admin. Code § 10-16-02-08(3) ("[A] retailer shall pay

11

Case 2:10-ap-05064-MPP    Doc 87    Filed 10/04/12    Entered 10/04/12 18:48:28    Desc
Main Document - Memorandum/Opinion    Page 12 of 16


the amount of a nonsufficient electronic funds transfer immediately by a certified or cashier's check or money order."); Ariz. Admin. Code § 19-3-214(B)(5) ("If payment from a retailer holding a full product license is returned to the Lottery for any reason, the retailer shall deliver a certified check, cashier's check, or money order, or make a direct deposit for the amount due to the Lottery's bank account within 24 hours of notification."); Mont. Admin. R. 2.63.801(4) ("A retailer must pay the amount of any nonsufficient fund sweep immediately by certified check, cashier's check, or money order."); 12 Mo. Code Regs. 40-20.030(1)(D) ("The retailer shall pay the amount of the NSF check by certified check, cashier's check or money order immediately upon notification of an NSF check as directed by the Missouri Lottery.").

As to Virginia specifically, Virginia Lottery stated in its trial brief that rules and regulations pursuant to Virginia Code Annotated § 58.1-4021(G) provide for payment by wire transfer after a check or draft is dishonored, but a rule or regulation expressly stating this was not cited. Virginia Code Annotated § 58.1-4021(G) does provide that if the director of the state lottery determines that the collection of any moneys will be jeopardized or delayed, he may adjust the time or interval of such collections, and the collection is expressly deemed to be jeopardized when a check draft, or electronic funds transfer is dishonored. In this same vein, 11 Virginia Administrative Code § 5-31-140(B) states that any retailer who fails to make a payment when due will be contacted and instructed to make immediate deposit of the funds due. And, as previously referenced, under 11 Virginia Administrative Code § 5-31-60(B), the director may designate another form of payment other than the EFT process. Thus, although these provisions do not expressly address wire transfer, they do provide support for the proposition that other methods of payment are contemplated when an NSF draft occurs. Consistent with these provisions, Mr. Lockhart testified that Virginia Lottery often took different styles of payment, presumably from its other retailers. Moreover, although each of the Wire Transfers took place on Wednesday, a day earlier than when the EFT process occurred, Mr. Lockhart testified that payment was due and payable on Wednesday morning, so the Wire Transfers were not paid early. Accordingly, the court concludes that the last four Wire Transfers were made according to ordinary business terms and are therefore excepted from avoidance under

§ 547(c)(2)(B).[*] *See Simon v. Gerdau MacSteel, Inc. (In re American Camshaft Specialties, Inc.)*, 444 B.R. 347, 366 (Bankr. E.D. Mich. 2011) (concluding that payments by wire transfers were made according to ordinary business terms).

### III.

The court turns next to the § 547(c)(4) defense. Under this section of the Bankruptcy Code, the trustee may not avoid a transfer:

> (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
>
> > (A) not secured by an otherwise unavoidable security interest; and
> >
> > (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

11 U.S.C § 547(c)(4). "This exception is premised on the theory that to 'the extent unsecured new value is given to the debtor after a preferential transfer is made, the preference is repaid to the bankruptcy estate.'" 5 *Collier on Bankruptcy* ¶ 547.04[4] n.94 (quoting *In re Prescott*, 805 F.2d 719 (7th Cir. 1986); *Jones Truck Lines, Inc., v. Full Serv. Leasing Corp.*, 83 F.3d 253, 257 (8th Cir. 1996) (rationale is that debtor's assets have not been depleted to the disadvantage of other creditors, when a creditor advances new value)). To establish the § 547(c)(4) defense, the creditor must establish that following payment by the debtor, "(1) the creditor gave new value to the debtor; (2) the new value was unsecured, and (3) the debtor, after receiving the new value, did not thereafter make an unavoidable transfer to the creditor." *The Garden Cos. v. CHS, Inc., (The Garden Cos.)*, 2005 Bankr. LEXIS 2972, *9 (Bankr. E.D. Tenn. Nov. 16, 2005). "New value" for purposes of

---

[*] The court did not address earlier the first component of § 547(c)(2), whether the debt for which payment was made was incurred by the debtor within the parties' ordinary course of business. As set forth in its trial brief, APPCO does not dispute that the debts for which the last four Wire Transfer payments were made were incurred by the debtor APPCO within the parties' ordinary course of business. APPCO was a licensed Virginia lottery retailer, and obtained lottery tickets from Virginia Lottery for sale to its retail customers as part of its business at its convenience stores, pursuant to the parties' retailer contract and state law. Also, Virginia Lottery was in the lottery ticket business, providing tickets to lottery retailers for sale, with the proceeds from the sale to be remitted to Virginia Lottery after deduction for certain authorized expenses. Accordingly, the first element of § 547(c)(2) was satisfied by the evidence.

§ 547 "means money or money's worth in goods, services, or new credit . . . ." 11 U.S.C. § 547(a)(2).

In the present case as previously noted, the Wire Transfer made on January 12, 2009, was in repayment of an EFT draft of January 8, 2009, that was returned for insufficient funds. Virginia Lottery conceded that this Wire Transfer was outside the parties' ordinary course of business, but maintains that it is excepted from avoidance under § 547(c)(4) to the extent of $30,446.25 because after January 12, 2009, Virginia Lottery gave new value in this amount in the form of instant ticket activations and on-line ticket sales.

In response, APPCO does not dispute that after January 12, 2009, it had instant ticket activations and on-line ticket sales of Virginia Lottery tickets in the amount of $30,446.25. APPCO asserts, however, that these new sales did not constitute extensions of unsecured credit by Virginia Lottery because the tickets and their proceeds were trust property of Virginia Lottery, which by definition did not replenish APPCO's bankruptcy estate since they never became APPCO's property. Consequently, maintains APPCO, the § 547(c)(4) defense is unavailable to Virginia Lottery as a matter of law.

The court disagrees. As noted, in its March 13, 2012 memorandum opinion, the court concluded that the Wire Transfers were property of the debtor APPCO because they had been commingled with APPCO's own funds and tracing was an impossibility. Thus, although initially the new tickets and their proceeds were trust fund property in which APPCO did not have a legal interest, when the proceeds were commingled with APPCO's own funds and tracing became an impossibility, the funds became property of APPCO and thus replenished its estate. To conclude that Virginia Lottery can not assert the § 547(c)(4) defense because it unwittingly extended unsecured credit is a result not warranted by the statute, its purpose, or equity. *Cf. Intercontinental Polymers, Inc. v. Equistar Chemicals, LP (In re Intercontinental Polymers, Inc.)*, 359 B.R. 868, 877 (Bankr. E.D. Tenn. 2005) (noting that for purposes of § 547(c)(4)(A), the relevant question is not whether new value was ever secured, but whether the security interest was avoidable and thus ineffective in bankruptcy).

Nonetheless, this court is unable to conclude that Virginia Lottery has established all of the

elements of the § 547(c)(4) defense. Although Virginia Lottery gave new value after the January 12, 2009 preferential transfer, APPCO made otherwise unavoidable transfers to Virginia Lottery after the delivery of this new value. More specifically, the evidence in trial Exhibits 12 and 13 indicate that after new value in the form of instant ticket sales totaling $12,000 were given on January 15, 2009, through January 18, 2009, APPCO paid Virginia Lottery by wire transfer the sum of $48,061.87 in payment of this new value. Similarly, the new value in the form of on-line sales that occurred between Wednesday morning and the next Tuesday night were billed to APPCO and included on each Wednesday's billing statement that APPCO paid by wire transfer on Wednesday afternoon. Thus, the on-line sales that occurred between January 15 and 20, 2009 were paid with the January 21, 2009 wire transfer; the on-line sales that took place between January 21 and 27, 2009, were paid with the January 28, 2009 wire transfer; and the on-line sales between January 28 and February 3, 2009, were paid with the February 5, 2009 wire transfer. Because the new value contributions advanced by Virginia Lottery to APPCO were paid by APPCO with payments that this court has concluded are unavoidable under § 547(c)(2), the new value does not satisfy the requirement in § 547(c)(4)(B) that it not be paid by an otherwise unavoidable transfer.

As explained by one court, "[i]f subsequent new value given by a creditor is paid with a subsequent advance from the debtor and this payment is subject to another affirmative defense (such as ordinary course of business, for example) which would make the payment 'otherwise unavoidable,' then the paid new value given cannot be used as an affirmative defense to any prior preferential transfer." *Roberds, Inc. v. Broyhill Furniture (In re Roberds, Inc.)*, 315 B.R. 443, 472 (Bankr. S.D. Ohio 2004). According to the Sixth Circuit, "[a] 'double credit' or 'double benefit' results if a creditor is permitted to avail himself of the 'new value' defense even though the debtor repaid the new value by an otherwise unavoidable transfer." *Russell v. Jones (In re Pro Page Partners, LLC)*, 151 Fed. Appx. 366, 369-70 (6th Cir. 2005); *see Mosier v. Ever-Fresh Food Co. (In re IRFM, Inc.)*, 52 F.3d 228, 231 (9th Cir. 1995) ("creditor should not get double credit for an advance of new value"); *In re Roberds, Inc.*, 315 B.R. at 471 ("the creditor gets credit only once for goods and services later supplied"). This restriction on the application of new value is logical when considered in light of the exception's purpose, which is protecting a preferred creditor to the extent that it has continued to supply goods that replenish the debtor's estate. *See Charisma Inv. Co. v. Airport Sys., Inc., (In re Jet Fla. Sys., Inc.),* 841 F.2d 1082, 1083 (11th. Cir. 1988). If a debtor has

15

repaid the new value, and the trustee is unable to avoid that payment because of another exception, the new value has not replenished the debtor's estate.

Lastly, however, the court notes that Virginia Lottery did make a few extensions of new value in the form of on-line sales after the last Wire Transfer. From February 4 through 9, 2009, on-line sales totaling $2,987.25 occurred for which Virginia Lottery was never paid. Because these sales represent subsequent new value that was unsecured and for which the debtor APPCO after receiving this value did not make an unavoidable transfer to Virginia Lottery, its preference exposure is reduced by this amount.

## IV.

Based on the foregoing, the court concludes that four of the five preferential payments at issue are excepted from avoidance under § 547(c)(2) and that a portion of the remaining preference is protected by § 547(c)(4). Accordingly, the plaintiff will be awarded a judgment against the defendant in the amount of $30,316.09 plus prejudgment interest from date of the filing of the complaint. *See Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.)*, 930 F.2d 458, 465 (6th Cir. 1991).

# # #